**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

GREGORY SCOTT DALTON d/b/a                                                      APPELLANT
LOUISVILLE ELECTRONICS, INC.

V.                                                                                 CIVIL ACTION NO. 1:13-CV-00107-SA

CELLULAR SOUTH, INC.                                                              APPELLEE

**MEMORANDUM OPINION**

Appellant Gregory Scott Dalton appeals the Bankruptcy Court's grant of declaratory relief in favor of Appellee Cellular South, Incorporated and dismissal of Dalton's counterclaim for damages. This Court's jurisdiction is predicated on its authority to hear such appeals as provided by 28 U.S.C. § 158.[1] After reviewing the briefs, prior record, rules, and authorities, the Court finds as follows:

*Factual and Procedural Background*

Dalton owned an electronics store in Louisville, Mississippi. In April 1992, he entered into a non-exclusive agency agreement with Cellular Holding, a predecessor corporation of Cellular South.[2] Cellular South is a wireless telecommunications services and equipment provider that has performed retail sales functions both through company-owned retail stores and by entering into agency agreements with independent contractors, like Dalton. Cellular South paid the independent contractors it used as agents a one-time commission for each new customer

---

[1] Title 28 U.S.C. § 158(a) provides:

> The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees; (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 . . . ; and (3) with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.

[2] At some point during the procedural history of this case, Cellular South changed its name to C Spire Wireless. For the sake of clarity and continuity, the Court will refer to Appellee using the same name employed by the Bankruptcy Court during the underlying proceeding.

signed by the agent. The agent received no additional compensation if a customer extended or renewed an existing contract or if an existing customer purchased new or upgraded equipment.

The original agreement between Dalton and Cellular South was replaced on March 1, 1993, by a similar agreement ("Agreement"), which is the contract in dispute. The provisions of the Agreement relative to the case at bar are, in pertinent part:

> 3.1 Term: The term of the Agreement shall be one year, commencing on the date specified in Exhibit D of this Agreement, unless otherwise terminated or renewed pursuant to the provisions hereinafter provided. Cellular [South] is cognizant of the increasing value of the Agency relationship to a successful AGENT and therefore will terminate a successful Agency relationship only if Cellular [South] determines that the continuation of the Agency relationship would be detrimental to the overall well being, reputation and goodwill of Cellular [South].
>
> . . .
>
> 3.3 Renewal: This agreement shall be automatically renewed for one-year terms unless terminated as herein provided.
>
> 3.4 Default: In the event AGENT fails to perform any of its obligations under this Agreement and such failure continues unremedied for a period of thirty (30) days after written notice is given by Cellular [South] to AGENT, then Cellular [South] may thereupon elect to cancel and terminate this Agreement, which termination shall be effective immediately upon the expiration of said thirty-day period.
>
> 3.5 Termination: Either party may terminate this Agreement by giving the other party written notice of its desire to terminate at least thirty (30) days prior to the intended date of termination.
>
> Further, Cellular [South] shall have the right to terminate this Agreement effective upon written notice if:
>
> A) AGENT makes an assignment for the benefit of creditors;
> B) An order for relief under Title 11 of the United States Code is entered by any United States Court against AGENT;
> C) A trustee or receiver of any substantial part of the AGENT'S assets is appointed by any Court; or
> D) AGENT (1) has made any material misrepresentation or omission in its application to establish any agency relationship with Cellular [South] or AGENT (or any principal thereof) is convicted of or pleads no contest to a felony or other crime or offense that is likely in Cellular [South]'s sole opinion to adversely affect the reputation of Cellular [South] or its affiliated companies or the goodwill associated with the Marks; (2) attempts to make an unauthorized assignment of

this Agreement; (3) receives a notice of violation of the terms or conditions of any license or permit required by AGENT or its employees in the conduct of AGENT'S Cellular Telephone Service business and fails to correct such violation; (4) fails to comply with any provision of this Agreement, or any tariff relating to Cellular Telephone Service and does not correct such failure within thirty (30) days after written notice of such failure to comply is delivered to AGENT; or (5) fails to comply with any material provisions of this Agreement, or any tariff relating to Cellular Telephone Service, whether or not such failures to comply are corrected after notice thereof is delivered to AGENT.

The agency relationship lasted until 2003, during which time Dalton operated a cellular-phone store in the same building as his electronics store and Cellular South paid him commissions as required by the Agreement. On December 19, 2003, Cellular South sent Dalton a notice of termination in the form of a letter from its Director of Sales, Terrell Knight. The letter explained Cellular South's reason for terminating the Agreement as follows:

> This letter serves as notice to you under the Authorized Agent Agreement executed by you and Cellular South pursuant to a reorganization of Cellular South's retail distribution plan, Cellular South is terminating its Agent Agreement with you effective February 6, 2004.

Cellular South also sent Dalton a Full and Final Release, which he refused to sign. At the same time, Cellular South terminated all of the other independent agencies. Of the approximately ninety other agents in Mississippi, only eight other agents had contracts containing the 3.1 clause found in the Dalton Agreement. The remaining agents' contracts were undisputedly terminable at will.

Cellular South originally initiated this action in the Circuit Court of Winston County, Mississippi, seeking a declaratory judgment that it had acted within its contractual rights in terminating the Agreement and that it owed no further duties to Dalton. Dalton filed a counterclaim for damages alleging wrongful termination and claiming that, pursuant to paragraph 3.1 of the Agreement, Cellular South could only terminate the Agreement if it determined that Dalton's individual agency was detrimental to its overall well-being, reputation,

and goodwill. After discovery, the parties each filed for summary judgment, and the Circuit Court granted summary judgment in favor of Cellular South. Dalton appealed and the Mississippi Court of Appeals affirmed. See Dalton v. Cellular South, Inc., 2008 WL 4212553, at *5 (Miss. Ct. App. Sept.16, 2008). On further appeal, the Mississippi Supreme Court reversed, finding that the Agreement was ambiguous and remanding the case to the Winston County Circuit Court for a determination by a jury as to whether Cellular South had breached the Agreement by terminating Dalton. See Dalton v. Cellular South, Inc., 20 So. 3d 1227, 1233 (Miss. 2009).

Prior to trial, Dalton filed for bankruptcy protection and removed the case to the Bankruptcy Court. Both parties expressly consented in writing to have the matter heard and determined by the Bankruptcy Court and for the Bankruptcy Court to enter final orders and judgments subject to appeal by this Court.[3] Following a bench trial, the Bankruptcy Court determined that Cellular South had not breached the Agreement and was within its rights to terminate Dalton. The Bankruptcy Court granted the declaratory relief sought by Cellular South and dismissed Dalton's counterclaim with prejudice. Dalton now appeals the Bankruptcy Court's ruling.

*Standard of Review*

This Court has jurisdiction to hear bankruptcy appeals as provided by 28 U.S.C. § 158. Pursuant to 28 U.S.C. § 157(c)(2), bankruptcy courts, with the consent of all parties, may hear and determine non-core proceedings and enter appropriate orders and judgments subject to appeal to the district courts. Under such circumstances, "the applicable standard of review by a district court is the same as when [a] [c]ourt of [a]ppeals reviews a district court proceeding. Findings of fact by the bankruptcy courts are to be reviewed under the clearly erroneous standard

---

[3] See 28 U.S.C. § 157(c)(2); In re Oxford Expositions, LLC, 466 B.R. 818, 827-29 (Bankr. N.D. Miss. 2011).

and conclusions of law are reviewed de novo." In re Chesnut, 422 F.3d 298, 301 (5th Cir. 2005); In re Evert, 342 F.3d 358, 363 (5th Cir. 2003) (citing Matter of Midland Indus. Service Corp., 35 F.3d 164, 165 (5th Cir. 1994)); In re Pequeno, 126 F. App'x 158, 162 (5th Cir. 2005).

While it is true that "[t]he interpretation of a contract—including whether the contract is ambiguous—is a question of law, which [is] review[ed] *de novo*[,]. . . [i]f a contract is ambiguous, the district court's findings of fact as to the intent of the parties are reviewed for clear error."[4] McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C., 736 F.3d 375, 377 (5th Cir. 2013) (citing Prescott v. Northlake Christian Sch., 369 F.3d 491, 495 (5th Cir. 2004) (citations omitted) ("If the contract is ambiguous, then 'the determination of the parties' intent through the extrinsic evidence is a question of fact.'"), disapproved on other grounds, 141 F. App'x 263 (5th Cir. 2005)). "[O]n appeal, the burden of showing that the findings of fact are clearly erroneous is on the party attacking them." Hughes v. Illinois Cent. R. Co., 58 F.3d 637, 1995 WL 371213, at *3 (5th Cir. 1995).

Federal Rule of Bankruptcy Procedure 8013 states in pertinent part that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Although:

> [a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . [t]his standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.

---

[4] Dalton argues that this Court should conduct a *de novo* review of the Bankruptcy Court's decision because it "is a case of contract interpretation." However, Dalton does not argue that the Bankruptcy Court's ruling constituted a conclusion of law. Rather, he contends the clearly erroneous standard of review is inapplicable because the Bankruptcy Court failed to fulfill its obligation to render a factual finding and its determination is not supported by evidence. Dalton's argument is without merit. The Mississippi Supreme Court, in an *en banc* opinion, specifically held that the Agreement is ambiguous and that the issue of whether Cellular South breached the Agreement is a genuine dispute of material fact to be determined by the factfinder. Dalton, 20 So. 3d at 1233. Accordingly, the question before the Bankruptcy Court was a factual one, and Dalton's belief that the Bankruptcy Court's determination was not supported by the evidence does not change the scope of this Court's review.

Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) (internal citation omitted).

> If the [factfinder]'s account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Id. (citing U.S. v. Yellow Cab Co., 338 U.S. 338, 342, 70 S. Ct. 177, 94 L. Ed. 150 (1949)).

*Discussion and Analysis*

Dalton designates the following five issues for the Court's review: (1) Was the Bankruptcy Court's decision contrary to preemptive rulings by the Mississippi Supreme Court? (2) Was the Bankruptcy court's decision manifestly wrong and contrary to the overwhelming weight of the evidence? (3) Did the Bankruptcy Court err in failing to award damages to Dalton contrary to the overwhelming weight of the evidence? (4) Did the Bankruptcy Court err in failing to award Dalton punitive damages? and (5) Did the Bankruptcy Court misinterpret the contract as a matter of law? Whereas this Court herein affirms the opinion of the Bankruptcy Court as to liability, it need not reach the third and fourth designated issues in this opinion. Accordingly, the Court addresses the relevant designated issues as follows.

<u>The Bankruptcy Court's decision was not contrary to rulings by the Mississippi Supreme Court.</u>

The Bankruptcy Court found that Cellular South terminated the Agreement in compliance with paragraphs 3.1 and 3.5. However, Dalton argues that the Mississippi Supreme Court "made several factual determinations" that the Bankruptcy Court failed to follow. Specifically, Dalton contends the Mississippi Supreme Court found that the Agreement was drafted by Cellular South and any ambiguities must therefore be construed in favor of Dalton and against Cellular South. However, Dalton misinterprets the court's opinion.

The Mississippi Supreme Court explained that "[c]ourts may use a three-tiered approach to contract construction, if required." Dalton, 20 So. 3d at 1232 (citing Pursue Energy Corp. v. Perkins, 558 So. 2d 349, 351 (Miss.1990)). "First, the 'four corners' test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement." Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc., 857 So. 2d 748, 752 (Miss. 2003). "Secondly, if the court is unable to translate a clear understanding of the parties' intent, the court should apply the discretionary 'canons' of contract construction." Id. at 753 (citations omitted). At this stage, "[w]here the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party." Id. (citing Leach v. Tingle, 586 So. 2d 799, 801-02 (Miss. 1991)) (further citation omitted).

Dalton misunderstands the court's duty at this second stage. Dalton argues that the Bankruptcy Court erred because it failed to interpret the Agreement as requiring a determination by Cellular South that Dalton's *individual* agency was detrimental to its overall well-being, reputation, and goodwill. However, the second tier of contract construction requires only that any ambiguities be resolved in favor of the non-drafter. Banks v. Banks, 648 So. 2d 1116, 1121 (Miss. 1994) ("[W]hen the terms of a contract are vague or ambiguous, they are always construed more strongly against the party preparing it.") (citations omitted). Courts are required to apply the canons of construction to resolve ambiguities, not accept wholesale the non-drafter's interpretation of the contract. See Harris v. Harris, 988 So. 2d 376, 379 (Miss. 2008) (rejecting one party's interpretation of a contract where the party's application of the canons of construction did not address the ambiguity in the contract). Additionally, "[t]he mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." Bros. v. Winstead, 129 So. 3d 906, 913 (Miss. 2014) (quoting Burton v. Choctaw County, 730 So. 2d 1, 6 (Miss. 1997) (further quotation omitted).

That Dalton and Cellular South disagree as to the meaning of paragraph 3.1 did not make the Agreement ambiguous as a matter of law. Indeed, the Mississippi Supreme Court found "the contract clauses, standing alone, are unambiguous. Giving the words their plain and ordinary meaning does not generate an ambiguity." Dalton, 20 So. 3d at 1232. It was only "when the clauses [we]re read together" that the court found the contract to be ambiguous because "the clauses conflict." Id. Thus, the Mississippi Supreme Court applied the second tier of contract construction in order to attempt to resolve this ambiguity. Id. at 1233. It did so by resolving the conflict between the clauses in favor of Dalton – reading 3.1 as limiting the right of Cellular South to terminate successful agencies at will under 3.5 – not by adopting one party's interpretation of the meaning of a single, unambiguous provision of the Agreement. Id.

Further, the court specifically stated that "resolving the ambiguity to give Dalton the most favorable interpretation does not end the inquiry" and held that "[t]he language of the contract requires the use of parol or extrinsic evidence" and "[w]hether [Cellular South] honored or breached the contract is a task for a jury. . . ." Id. The court remanded this matter in order for the factfinder to proceed to the third tier of contract construction using parol evidence to determine the parties' intent. Id. It is clear then that the Bankruptcy Court was not restricted to the second tier of contract construction in order to determine whether the Agreement was ambiguous as a matter of law, but rather was instructed by the Mississippi Supreme Court to utilize the third tier and parol evidence in order to make a factual determination as to whether Cellular South breached the Agreement.

Dalton also argues that the Bankruptcy Court readopted and reaffirmed the affidavit of Cellular South's CEO, Hu Meena, as the factual basis for its determination at trial, despite the Mississippi Supreme Court having found the affidavit insufficient to justify Cellular South's

termination of the agreement. Here again, Dalton misstates and misapplies the Mississippi Supreme Court's ruling.

The Mississippi Supreme Court addressed two issues in its opinion: (1) whether the circuit court erred in finding the contract unambiguous and (2) whether the circuit court erred in its summary judgment decisions. Id. at 1231. The court addressed the sufficiency of Meena's affidavit in its discussion of the second issue. Id. at 1233-1235. While the court did describe Meena's affidavit as "conclusory" and "self-serving," id. at 1235, it found only that the affidavit was "insufficient as a basis to grant summary judgment." Id. at 1233-34. The court further explained that its "disdain for conclusory, self-serving affidavits" was particularly important "considering [the court's] requirement to view the evidence in the light most favorable to the nonmovant." Id. at 1234.

Unlike at the summary judgment stage, the Bankruptcy Court, as the factfinder at trial, was no longer bound to view the evidence in the light most favorable to Dalton, but rather its duty was to weigh the evidence and make credibility determinations. See Peel & Co., Inc. v. The Rug Mkt., 238 F.3d 391, 394 (5th Cir. 2001); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Thus, the Mississippi Supreme Court's holding that Meena's affidavit was insufficient for a grant of summary judgment did not preclude the Bankruptcy Court from considering the affidavit together with the other evidence produced at trial, which included the in-court testimony of both Meena and Dalton.

Dalton further argues that the Bankruptcy Court ignored the Mississippi Supreme Court's holding that the Agreement "was not terminable at will and that paragraph 3.1 must be interpreted." At no point in its opinion did the Mississippi Supreme Court hold that the Agreement was not terminable at will. Indeed, the very issue before the Bankruptcy Court was to determine "when and how the contract [could] be terminated" given that the "contract fail[ed]

9

to provide clear direction as to which termination clause applie[d], without consideration of extrinsic evidence." Dalton, 20 So. 3d at 1232. The Mississippi Supreme Court held that "reasonable minds could reach different conclusions after reading the whole contract, in discerning the intent of the parties, while giving effect to each separate clause," including paragraph 3.1, and "the conflicts among the clauses create an ambiguity." Id. at 1233.

After recognizing the conflicting provisions of the Agreement, the court attempted to resolve the resulting ambiguity by construing the Agreement in favor of Dalton – reading 3.1 as limiting the right of Cellular South to terminate successful agencies at will under 3.5. Id. However, the court held that the Agreement was still ambiguous under this second tier of contract construction because parol evidence was required to determine whether 3.1 applied to Dalton. Id. The court noted that the parol evidence existing in the record before it, Meena's affidavit, suggested on the one hand that 3.1 did apply to Dalton as Meena attested that "Dalton's agency was a successful agency. . . ." Id. On the other hand, though, the court seemed to find this evidence insufficient as it noted that Meena's affidavit, when read to mean that 3.1 applied to Dalton, raised questions as to Cellular South's true reasons for terminating the Agreement. Id. Thus, the court remanded the case for a determination by a jury as to whether Cellular South had breached the Agreement. Id.

Dalton is not incorrect when he argues that the Bankruptcy Court was required by the Mississippi Supreme Court's holding to interpret paragraph 3.1. The Bankruptcy Court was required to interpret all of the provisions of the Agreement, in light of parol evidence, to determine whether Cellular South breached the Agreement, and it did so at trial. Based upon the evidence presented, the Bankruptcy Court found that paragraph 3.1, even if applied to Dalton, did not require Cellular South to make any determination regarding Dalton's *individual* agency in order to terminate the Agreement. The Bankruptcy Court found that Cellular South had made

a determination that continuing any agency relationship, including Dalton's, would have been detrimental to the overall well-being, reputation, and goodwill of Cellular South and that Cellular South was therefore within its rights when it terminated the Agreement.

### The Bankruptcy Court did not misinterpret the contract as a matter of law.

Despite designating this issue for appeal, Dalton himself acknowledges in his rebuttal brief that "[t]he Mississippi Supreme Court remanded the case for a factual determination." As the Court has explained at length *supra*, the Bankruptcy Court was tasked with making a factual determination as to the intent of the parties, not with deciding a question of law. Dalton's argument on this issue has no merit.

### The Bankruptcy Court's decision was not manifestly wrong and contrary to the overwhelming weight of the evidence.

The language used by Dalton in designating this issue for appeal tracks the standard for appellate review of findings of fact by chancellors under Mississippi law. See Rotenberry v. Hooker, 864 So. 2d 266, 269 (Miss. 2003) ("If found ambiguous, the subsequent interpretation of the contract is a finding of fact. We will uphold a chancellor's findings of facts unless they are manifestly wrong or against the overwhelming weight of the evidence.") (internal citation omitted) (citing Richardson v. Riley, 355 So. 2d 667, 668 (Miss. 1978)). However, as the Court explained *supra*, this Court's standard of review of the Bankruptcy Court is "the same as when [a] [c]ourt of [a]ppeals reviews a district court proceeding." In re Chestnut, 422 F.3d at 301. For the reasons previously discussed, the Court must apply a clearly erroneous standard of review to the Bankruptcy Court's ruling and may only reverse the Bankruptcy Court's findings of fact if the Court, having reviewed all of the evidence, "is left with the definite and firm conviction that a mistake has been committed." Anderson, 470 U.S. at 573, 105 S. Ct. 1504.

At trial, Meena testified that he had been the person with the most authority over the day to day operations of Cellular South from around 1991 to the present day. He testified that he had been involved with Cellular South's agency program since the company first began contracting with independent agents in accordance with industry practice. Agents were paid a commission for each new customer the agent signed to Cellular South service but would not receive any further compensation for existing customers who extended their contracts or upgraded to new equipment. As a result, the agents' business model focused on signing as many new customers to the Cellular South network as possible.

Meena testified that as the cellular telephone industry grew and changed, the drivers of consumer choice also shifted. Due to greater competition from national carriers, consumers began to choose cellular service providers based on considerations such as competitive service rates and availability of popular devices rather than coverage areas. Additionally, as a result of market saturation, Cellular South began focusing more on acquiring customers from other service providers as opposed to signing up individuals who had not previously had cellular service. Meena testified that customer service was very important to Cellular South because it helped lower "churn" – the loss of existing customers.

Meena testified that Cellular South had always had problems managing its agents and explained that it had been difficult to get the agents to follow Cellular South's policies and procedures and to do the administrative work necessary to meet Cellular South's customer service standards. He testified that it was his belief that, as a whole, agents did not provide the same level of customer service as Cellular South's company-owned retail stores. In fact, Meena testified that eighty percent of the activity in its retail stores was customer service related. Meena testified that Cellular South made no profits from the sale of its devices, instead taking a loss on each sale. Cellular South's business model was to attract customers with low service

rates and pricing on devices with the hope of retaining those customers over the long term. Meena testified that it might take as long as sixteen to eighteen months before a customer would become profitable for Cellular South and that churn caused by poor customer service specifically harmed Cellular South's reputation and good will.

In his affidavit, Meena cited administrative burdens as playing a large role in his decision to terminate the agent agreements, including Dalton's. Specifically, Meena claimed Cellular South was burdened by:

> assigning a dedicated management employee to oversee the agents, keeping up with commissions earned by the agents, which did not vest until the customer had remained with Cellular South for a pre-determined period of time, and insuring that agents were marketing Cellular South's service in a manner consistent with Cellular South's corporate marketing strategy.

At trial, Meena expounded on the problems that he claimed Cellular South had with its agents. He testified that Cellular South had had an ongoing struggle to ensure agents followed its procedures and policies. He cited problems with money transfers between the agents and Cellular South, as well as problems with bookkeeping records and conflicts over the pricing of devices. The agents purchased the devices either directly from Cellular South or from the manufacturer and then resold them. Cellular South, which Meena claimed was already taking a loss on each device, would frequently decrease the retail price of its devices in order to attract new customers. Though not required by Cellular South to charge any particular price for devices, the agents would lose resale profits if they followed Cellular South's pricing promotions.

Meena also testified that uniformity in signage and printed marketing materials was a problem with the agents. Whereas branding and marketing were very important to Cellular South's ability to attract and retain customers, agents had different signage and sometimes individual advertising. Further, Meena testified that a problem of particular concern to Cellular

13

South was that agents had a significantly higher rate of churn than Cellular South's retail stores, telesales centers, or online sales. Meena explained that this "made it very challenging to run [Cellular South's] business when [they] were bringing in X amount of customers and so many of them were leaving." Meena testified that all of these problems had been pervasive with the agency program since its inception and that Cellular South had never been able to get the agency program to work in a way that met its requirements.

With respect to the Agreement, Meena testified that he alone made the decision to terminate the agents' agreements, including Dalton's. He testified that he was generally familiar with the terms of the Agreement and that, based upon his years of experience working with Cellular South's agency program, Cellular South's intent was to be able to terminate the agent agreements, including Dalton's Agreement, at will. Meena testified that the ability to terminate the agent agreements at will was consistent with Cellular South's business philosophy and that all of Cellular South's other employees were at will.

Though Meena stated in his affidavit that Dalton's agency was a successful agency in term of sales, he testified at trial that his definition of success meant more than just sales. He testified that he did not believe the agent program was successful because success also required agents to have the ability to provide customer service and administrative work and to prevent churn. Meena testified that the termination letter Dalton received was written at his direction and that the stated reason for terminating the Agreement, the reorganization of Cellular South's distribution plan, was the true reason for terminating the Agreement and was necessitated by the problems he outlined for the court. Meena testified that he decided to terminate the agent

agreements, including Dalton's Agreement, because he believed it was in the best interest of Cellular South and was consistent with its overall well-being, reputation, and good will.[5]

Dalton, however, testified that he believed Cellular South could only terminate the Agreement for cause. He testified that he understood paragraph 3.1 of the Agreement to control and that any other termination provisions were subordinate to 3.1. However, Dalton testified that this belief was based only on his interpretation of the Agreement itself, not on anything anyone told him, and that he did not negotiate the terms of the Agreement before he signed it. He testified that Cellular South had presented him with a new contract around 2001 that did not contain paragraph 3.1, but he refused to sign it.

Dalton further testified that he received no complaints from Cellular South during the course of his agency but admitted there had been a few situations involving late payments from Dalton to Cellular South for phones Dalton had purchased to resell. He testified that he had signed approximately 6,600 customers for Cellular South at the time Cellular South terminated the Agreement but admitted that he was only able to sell new lines and was not able to upgrade existing customers. Dalton testified that he received no notice from Cellular South that his agency was detrimental to Cellular South's overall well-being, reputation, or goodwill and that he refused to sign the release presented to him by Cellular South.[6]

The Bankruptcy Court found that "Cellular South terminated the Agreement after determining the agency program in its entirety was detrimental to the overall well being, reputation, and goodwill of Cellular South." Further, the Bankruptcy Court found Cellular

---

[5] Cellular South also offered the testimony of Brian Templeton, regional manager for Cellular South. Templeton testified that he had worked as a market manager covering territory that included Dalton's agency from around 1997 until 2011. He testified that Dalton was generally successful in terms of sales and activating new customers but that Dalton could not offer existing customers new devices at Cellular South's promotional prices or renew their contracts. He also testified that he had had some problems collecting on equipment sales to Dalton and that he was confident his territory would have been able to meet its sales quotas even without Dalton's agency.

[6] Dalton offered no other witnesses to support his interpretation of the Agreement.

South's termination of the Agreement to be consistent with paragraphs 3.1 and 3.5 of the Agreement. The Bankruptcy Court found that Dalton's interpretation of the Agreement was "extremely narrow" and that it ignored "the intent of the first sentence of Section 3.1, as well as, Section 3.5."

Viewing the record evidence as a whole, this Court cannot say the Bankruptcy Court's findings are unreasonable. This case essentially involves two parties who disagree over the meaning of the terms of a contract. Even if this Court were to weigh the evidence differently or attribute greater credibility to the testimony of Dalton than to that of Meena, such a finding would not be sufficient to overrule the Bankruptcy Court's determination. The Bankruptcy Court's findings are plausible in light of the entire record, and as such, this Court finds it did not commit clear error.

*Conclusion*

Accordingly, the Court AFFIRMS the Bankruptcy Court order, and this appeal is DISMISSED. A separate order to that effect shall issue this day.

SO ORDERED on this, the 19th day of March, 2014.

 /s/ Sharion Aycock
 **UNITED STATES DISTRICT JUDGE**